### 10954

#### MATHESON *ET AL.* v. MATHESON

#### (118 S. E. 312)

1. WILLS—TEST OF "TESTAMENTARY CAPACITY" STATED.—Testator's capacity to know his estate, the object of his affections, and to whom he wished to give it, is the test of mental capacity to make a will.

2. APPEAL AND ERROR—EXCEPTIONS OVERRULED, COURT BEING EQUALLY DIVIDED.—Where the Supreme Court is equally divided, the exceptions raising the questions will be overruled.

3. WILLS—TESTAMENTARY CAPACITY HELD NOT TO VARY WITH SIZE OF ESTATE.—An instruction that, to execute a valid will, testator must be of sound mind with reference to what is involved in the transaction, and that varies according to the extent and value of the property and the character of the disposition, *held* error, in view of Civ. Code 1912, § 3563, as testamentary capacity does not vary with the size of the estate.

Before McIVER, J., Marlboro, Summer, 1921. Reversed and remanded.

Proceeding for the probate of the will of A. J. Matheson, deceased, by A. D. Matheson and others, opposed by J. J. Matheson. From a judgment of the Circuit Court on appeal from a decision of the Judge of Probate admitting the will to probate, proponents appeal.

*Messrs. McColl & Stevenson,* for appellants, cite: *Degree of capacity required to make a will:* 7 Rich. L., 474; 50 Am. Dec., 329; 4 McC., 183; 26 Wend., 255; 107 S. E., 492; 35 Ann. Cas., 359; 11 Fed., No. 6141; Ann. Cas., 1916-C, 21; 1 Cheves L., 37; 1 Spears L., 107; 1 Rich. L.,

80; 50 S. C., 105; 19 Ill., 520; 67 Mo., 574; 66 A. S. L.,
202; 25 N. Y., 9; 55 Hun., 7; 145 Ill., 264; 74 Ill., 33; 62
Ill., 196. *Weight to be given opinion testimony:* 57 S.
C., 406.

*Messrs. Willcox & Willcox,* for appellants, cite: *Char-
acter of proceeding:* 113 S. C., 270; 101 S. C., 287; 86 S.
C., 470; 74 S. C., 189. *Right of testator to dispose of his
property:* 101 S. C., 287; 96 S. C., 94; 100 S. C., 348; 105
S. C., 496; 110 S. C., 414; 107 S. C., 470. *Mental capacity
requisite to make a valid will:* 12 Rich., 232; 71 S. C., 331;
90 S. C., 208; 65 S. C., 558; 4 McC., 193; 6 Ga., 324.
*Character and extent of evidence necessary to show mental
capacity:* 4 McC., 183; Mills, Const., 225; 3 Hill, 73; 86
S. C., 470; 107 S. C., 57; 2 Rich., 229; 3 Hill, 341; 110
S. C., 182; 110 S. C., 357; 107 S. E., 492; 2 Gr. Ch., (N.
J.), 549; S. C. B. (N. S.), 87. *Testator must have been
non compos mentis at time of execution of will to set it
aside:* 101 S. C., 287; 71 S. C., 331; 2 Rich., 229.

*Messrs. D. W. Robinson, Thomas & Lumpkin, Townsend
& Rogers, Gibson, Muller, & Tison, J. J. Evans* and *N. W.
Edens,* for respondents, cite: *Motion for nonsuit or directed
verdict proper where parties claim there was no evidence:*
101 S. C., 291; Rule 77, Civ. Ct.; 115 S. C., 229; 102 S. C.,
491; 109 S. C., 346; 84 S. C., 484; 72 S. C., 419; 92 S. C.,
582. *Contest of will is action at law:* 113 S. C., 276; 82 S.
C., 42; 106 S. C., 83; 74 S. C., 192; 12 Rich. Eq., 205; Rich.
L., 280; Code Proc. 1912, Sec. 66; 1 Civ. Code 1912, Sec.
3579. *Issue was within province of jury:* 107 S. C., 75;
74 S. C., 192; Rice. L., 280; 106 S. C., 83; 86 S. C., 477;
82 S. C., 42; Page on Wills, Sec. 334. *Findings of fact
conclusive:* 101 S. C., 430; 102 S. C., 33; 101 S. C., 140;
95 S. C., 67; 114 S. C., 349; 96 S. C., 267; 98 S. C., 273;
77 S. C., 378; 59 S. C., 564; 74 S. C., 144; 59 S. C., 162.
*If equitable, issues of fact submitted and finding not re-
viewable:* Code Proc. 1912, Sec. 11, Subd. C.; 110 S. C.,

366; 106 S. C., 337; 77 S. C., 319; 82 S. C., 205. *Sufficiency of evidence:* 107 S. C., 461; 109 S. C., 300; 103 S. C., 117; 81 S. C., 828. *Weight of evidence:* 104 S. C., 486; 112 S. C., 91; 74 S. C., 230; 92 S. C., 125; 114 S. C., 349; 94 S. C., 311; 100 S. C., 28; 114 S. C., 280. *Burden of proof on proponents:* 82 S. C., 42; 1 Alex., Wills, Sec. 400; 1 Schouler, Wills (5th Ed.), Sec. 170; Page, Wills, Sec. 370; 107 S. C., 72; L. R. A..1918-D, 758. *Mental capacity:* 111 S. C., 111; 103 S. C., 355; 105 S. E., 351. *Testamentary capacity:* 27 L. R. A .(N. S.), 5; 1 Schouler, Wills, Sec. 68, 71, 72; 1 Alex., Wills, Sec. 329; L. R. A. 1916-A, 445; 50 S. C., 106; 7 Rich. L., 476; 90 S. E., 3; Rice L., 275; 15 N. J. Eq., 243; 27 Atl., 742; 6 L. R. A., 170; 95 N. E., 1085. *Undue influence:* 115 S. C., 359; 1 Bail. L., 96; 19 S. E., 113. *Impeachment of witness:* 70 S. C., 190; 35 S. C., 474; 34 S. C., 321; 94 S. C., 442; 74 S. C., 12; Ell., Evid., Sec. 974; 82 A. S. R., 41; Jones, Ev., Sec. 842. *Expert evidence:* 89 S. C., 534; 59 S. C., 318; 65 S. C., 444; 65 S. C., 25; 108 S. C., 473; 108 S. C., 87; Jones, Ev., Sec. 378; 11 R. C. L., 600; 32 S. C., 400. *On issue of mental capacity and undue influence all surrounding circumstances must be considered:* 105 S. C., 502; 107 S. C., 72; 1 Schouler, Wills, Secs. 185, 192; 103 S. C., 404; 6 L. R. A., 171; 49 S. C., 169; 107 S. C., 73; 111 S. C., 375; 1 Alex., Wills, Secs. 361, 362, 363; 114 S. C., 541.

June 12, 1923.

The opinion of the Court was delivered by MR. JUSTICE FRASER.

The testator, A. J. Matheson, was a remarkable man. His education in books and the schools was limited. His education by circumstances was excellent. He was a man of good character, of bright mind, good judgment. He made up his mind quickly. He was a man of indomitable will, and full of physical energy. He was a planter on a

large scale, a merchant, a bank president, engaged largely in buying and selling real estate in Bennettsville and in the country. He owned several plantations and many city and town lots. He also was engaged in buying and selling cotton and cotton seed. In February, 1917, he suffered a stroke of paralysis, and was unconscious for several days. He partially recovered from this stroke. His malady is called paralysis. In March, 1918, Mr. Matheson executed his will, which is the subject of these proceedings. In September, 1918, Mr. Matheson had another stroke, from which he died. His will was admitted to probate by the Judge of Probate for Marlboro County in solemn form. The contestants appealed, and the appeal was heard in the Court of Common Pleas with a jury. Three questions were submitted to the jury, to wit:

(1) Did A. J. Matheson, at the time the paper propounded for probate was executed, have sufficient mental capacity to make his will and understand its contents?

(2) Was the said alleged will procured by the undue influence of A. D. Matheson upon the mind and will of the said A. J. Matheson, exerted before or at the time of the alleged execution of same?

(3) Is the paper writing offered for probate herein the true will and expression of A. J. Matheson?

The jury answered to each of these questions, "No."

While there was no separate motion for a direction of a verdict in favor of the will, the proponents of the will made requests to charge containing instructions that there was no evidence to sustain a finding that the will was not the will of Mr. Matheson, and these requests were so treated in the trial of the cause and refused. From the judgment based on the finding of the jury this appeal is taken.

There was no claim that Mr. Matheson did not execute the will, so far as the physical requirements are concerned. The claim was that Mr. Matheson did not have sufficient

mind to execute a will, and that the will was really the work of his son, A. D. Matheson, who was the confidential clerk, procured through undue influence. Undue influence is eliminated by the verdict of the jury.

The question is: Is there any evidence that Mr. Matheson did not have mind enough to make a will?

We must, therefore, determine how much mind is necessary to make a will.

The law is clearly stated in *Gable v. Rauch,* 50 S. C., pp. 105 and 106; 27 S. E., 555, 558, where we find:

"The fourteenth exception alleged error in the charge of the Circuit Judge when he stated to the jury 'that less mental capacity, lower degree of mental power, is necessary (required) to make a valid will than a valid contract. This extract from a charge of the Circuit Judge gives but a slight idea of that part of such charge which relates to the requisite mental capacity of a person making a valid will, as we shall presently show by quoting the language of the charge. Still, even the extract quoted by appellant is not without authority, even in this State. In the case of *Kirkwood v. Gordon,* 7 Rich., 479, it is said: 'It is objected that the test of testamentary capacity furnished by the Judge' (O'Neall, afterwards Chief Justice) 'was error, and may have misled the jury. "I said," says Judge O'Neall, "to the jury that the test—'capacity enough to make a contract'—was not always the true rule; for sometimes it might be that a higher degree of capacity to make a contract would be required than to make a will. In making a will, if the testator had capacity enough to know his estate, the object of his affections, and to whom he wished to give it, that would be enough." These views are well sustained by authority; quoting *Comstock v. Hadlyme,* 8 Conn. R., 254; *Greenwood v. Greenwood,* 3 Curtis, appendix II.' But the Circuit Judge left the jury in no doubt as to the law regulating the capacity required of a testator, for he said: 'I charge you that the test of capac-

ity to make a will is this: Did the testator, at the time of
the execution of the will, know what he was doing; did he
know his property and the objects of his bounty; did he re-
member those that he was leaving out of his will, and did
he do it on purpose; and did he intend to include only those
that he made beneficiaries of his will? I charge you further,
that mere weakness of mind, or feebleness of mind, is not
enough to invalidate a will. Incapacity is more than that.
You must be satisfied before you find incapacity—you must
be satisfied by the preponderance of the evidence—that Gable
did not know what he was doing when he wrote that will;
that he did not have intelligence enough to comprehend the
nature and effect of what he was doing; that he did not
know the property he was trying to dispose of, and the ob-
jects of his bounty, those to whom he intended to leave his
estate; and you must be satisfied of that before you can find
that Gable did not have mental capacity to make a will.' Just
after this language, the Circuit Judge used that quoted in the
exception, but added much."

In *Black v. Ellis,* 3 Hill, 74, we find:

"The legal test of capacity being properly put to the jury,
it then was necessary that the jury should decide from the
facts, whether he had that much capacity at the moment of
execution, and a want of it at that time, the appellants were
bound to show."

In some cases there is added a requirement that the
testator must know that he is disposing of property.

The requirement need not complicate this case, as
there is no question but that Mr. Matheson knew he was
making his will. The question that concerns us here is:
Is there any evidence that Mr. Matheson did not know his
estate, or the objects of his affection, or to whom he wished
to give it? Upon this question this Court is divided, so
that the exception that raises this question must be over-
ruled.

II. The next assignment of error that will be con-sidered is:

"By disposing of his property I mean that he must be in such condition as not to know, not to realize, the effect of what he is doing, or realize that he is favoring one above another, or give it in a way that was not an ordinarily fair disposition of it."

This was error.  It substitutes the judgment of the jury for the judgment of the testator as to what is a fair disposition of the testator's property.  The Statute of Distributions makes what the world considers a fair disposition of property.  The right to make a will carries with it the right to disregard what the world considers a fair disposition of property.  In the case of *Lee's Heirs v. Lee's Executors*, 4 McCord, 183; 17 Am. Dec., 722, we find:

"That a will is unjust to one's relations is no legal reason that it should be considered an irrational act.  The law puts no restrictions upon a man's right to dispose of his property in any way his partialities, or pride, or caprice may prompt him."

This exception is sustained.

III. The next assignment of error is that his Honor charged the jury that it takes more mind to dispose of a large estate than it does to dispose of a small estate.  We know of no authority for this statement.  Wills are frequently made when the testator is in extremis, when his body is weakened by disease and his mind is weak, too.  As has already been said, the test of capacity to make a will is this:  Did the testator, at the time of the execution of the will, know what he was doing; did he know his property and the objects of his bounty; did he remember those that he was leaving out of his will, and did he do it on purpose, etc?  When it is said the testator must know his property, it means know it substantially.  A man of large and diversified interests is not deprived of the power to make a will because he has for the moment forgotten a

purchase or sale.  The question is:  Is the will an irrational act?

The other questions refer to matters incident to that trial, and are not likely to be repeated.  They need not be considered.

The case has not been prepared in accordance with the rule, and appellant must pay for the printing of the case. Much irrelevant testimony had been introduced.  This Court understands the embarrassment of the parties to this proceeding, and why they should have refrained from objecting to incompetent testimony; but a disregard of the rules of evidence only leads to confusion.  The question is: Did Mr. Matheson know what he was doing? as above explained and only testimony that throws light upon that question should be allowed.  Let the next trial be according to law.

The judgment is reversed, and a new trial ordered as to Mr. Matheson's capacity to make a will.

MR. CHIEF JUSTICE GARY and MR. JUSTICE COTHRAN concur.

MR. JUSTICE WATTS (dissenting):  I think, as to the whole trial, from start to finish, that the trial Judge committed no prejudicial error, either in commission or omission, and that all exceptions should be overruled, and judgment affirmed.

MR. JUSTICE MARION (concurring):  This cause was first heard and decided before my accession to the bench. Respondents having filed a petition for rehearing, it became necessary for me to participate in the decision of that question.  It was resolved favorably to petitioner's prayer, to the end that counsel should have the opportunity and the Court the benefit of the reargument.  The case has been elaborately and very ably argued.  I have carefully examined the voluminous record, and have given to the points raised by the appeal as close and mature consideration as the time at my command permitted.

In the view upon which my conclusion is predicated it will not be necessary to undertake the difficult task of analyzing and reviewing the evidentiary facts. I think the point upon which the appeal turns is that raised by the appellant's tenth, eleventh, and twelfth exceptions, directed to the imputation of error on the part of the trial Judge in charging the contestant's third request, as follows:

"A testator in order to execute a valid will must be of sound mind with reference to whatever is involved in the transaction, and that varies according to the extent and value of the property and the character of the disposition."

The Judge's explanatory comment as to that proposition was in this language:

"I charge you that; I have charged you practically that before. I charge you (and that is by way of illustration only) that a man, if he owned only a small property, such as a house and lot in town, and wanted to leave it to his wife, if he knew he wanted to leave it to his wife, and had only mental capacity sufficient to know that he owned his property and wanted to leave it to his wife after his death, if he knew that, then his will to that effect would stand where a will involving a great deal of property, divided amongst a number of people, might not stand. He must have sufficient mental capacity; enough sense to do what he wants to do."

There can be no doubt that the learned trial judge clearly and correctly charged the jury that the test of the "sound and disposing mind and memory" required for the execution of a valid will was whether the testator had the capacity to understand the nature of his act, to know his property, and to remember and recollect the natural objects of his bounty. There can likewise be no doubt that the clear import of the instructions excepted to was to add to that accepted and long-established general formula for defining or describing the test of testamentary capacity a definite method or rule for proving or testing the test

itself, which meant, or could readily be construed to mean, this: As is the property in "extent and value," so must the "sound and disposing mind and memory" be in grasp and strength; as is the difficulty and complexity, ethically, legally, and mathematically, of adjusting the equitable disposition thereof among the natural objects of a man's bounty, so must his mind be in power to overcome the difficulties and in acumen to resolve the complexities. Concretely applied, in the light of the Judge's illustration, let us assume that A. J. Matheson and his next door neighbor were each possessed of exactly the same degree of mental capacity—the same ability to perceive facts through the senses, to retain them in mind, and apprehend their import, and to form a rational conclusion from the facts so perceived and remembered. If the neighbor had only a small property, a house and lot, and devised it to his wife, he would have testamentary capacity, and his will would be valid; but if A. J. Matheson, with property approximating $1,000,000 in value, undertook to will it in certain proportions to his wife and children, he would not have testamentary capacity, and his will would be invalid. And that would be so because testamentary capacity means, as held by the Circuit Judge, "a sound mind with reference to whatever is involved in the transaction, and that varies according to the extent and value of the property and the character of the disposition." The proposition thus announced may be considered in two aspects:

First, may testamentary capacity, under the settled law of this jurisdiction, be judicially defined as a variable quantity in the sense that it depends upon the extent and value of a person's estate and the character of its disposition? My understanding of the law, as applied in this State from the beginning of our judicial history, is that testamentary capacity has always been regarded as essentially a question of sanity. "Unsound mind," "*de non sane memory*," is the language of our statute law, descriptive of a lack of testa-

mentary capacity. Section 3563, Civ. Code 1912. Obviously, the sanity with which we are here concerned is the sanity of the law, and not of medical science. From the viewpoint of medical science it has been said the mind that is wholly sane or sound is as rare as the body that is wholly sound. Sanity from the standpoint of the law, however, has to do wholly with the degree of mental capacity that in the interests of organized society should be required to enable the citizen to exercise certain civil rights or to charge him with responsibility to others for his acts. In seeking to prescribe the degree of mental capacity that should entitle a person to dispose of his property by will, the law of necessity approaches the problem from the standpoint of the common good, and seeks to strike a just and workable average. If it be assumed that the right to dispose of property by will is a right so intimately related to the social and economic health and prosperity of organized society as to entitle it to the effectual protection of the law, then the law's standard of the citizens mental capacity to exercise this important right must be such a standard as will effectually safeguard the right. In prescribing such a standard there are practical considerations of controlling importance. A will speaks from the date of death. If it is to speak intelligently its provisions should be adjusted and conformed as nearly as may be to conditions obtaining at the testator's death. A man's financial condition and his family relations and obligations may be, and frequently are, very different at the time of his death from what they were years, months, or even days and hours before. Ordinarily a will made in the heyday of a man's intellectual competency and financial prosperity would speak a language entirely foreign to the changed circumstances that surround him when death comes "in the sere and yellow leaf." If a will is reasonably to subserve the very purpose of its making, the right to make it must be accorded to a testator when death is near. In the course of nature, at such a time,

whether brought about by disease or old age, a person's
mental capacity may be, and usually is, far below normal
as compared with that particular individual's mental strength
in the days of physical·health and vigor. Obviously the
law's standard of testamentary capacity must be fixed in
contemplation of the foregoing considerations.

Another reason justifying the fixing of a standard of
testamentary capacity adjusted to the mental weakness that
accompanies physical failure and infirmity is the practical
consideration that the right to dispose of one's property
to take effect after death is often the most efficient, and
sometimes the only, means that the physically afflicted and
the aged and infirm have to command the humanitarian at-
tentions due to their infirmities or to their isolation and
loneliness. If because of a man's age and infirmities, even
his children may safely treat as nonexistent his right to will
his property as he pleases, they will too often have lost the
"pregnant and potential spurs" to the discharge of filial
duty. But it is unnecessary to extend the discussion as to
the rationale of the rule that prescribes what is universally
conceded to be a low standard of mental capacity for the
execution of a valid will. It is a standard fixed for the
same reason and for the same purpose, in a general way,
that the law undertakes to formulate standards of mental
capacity in relation to other civil rights and responsibilities,
such, for example, as the capacity to contract and the ca-
pacity to commit crime. These standards, imperfect at best,
are of necessity arbitrary and general in their nature. Thus
a man's right to contract and his responsibility therefor—
contractual capacity generally—does not necessarily depend
upon his mental ability with respect to a particular contract,
nor does capacity to commit crime depend upon a person's
mental ability in relation to a particular crime; if he is
*compos mentis,* if his mind measures up to the fixed general
standard of sanity, he has in contemplation of law contrac-
tual capacity, on the one hand, or capacity to commit crime

on the other.    So with the legal standard of testamentary capacity; it is the law's attempt to prescribe in as precise terms as possible the general standard of mental capacity, within the limits of which a person may "at his own free will and pleasure" (Section 3563, Civ. Code 1912), exercise the right of disposing of his property by will.    If that view is essentially sound I do not think that testamentary capacity may consistently be defined as a variable quantity—a degree of capacity that would be sufficient for the making of one kind of will, but not of another, or a degree of capacity sufficient for the making of a will by one person but not of another.

It is plausibly argued that the accepted test of capacity that a person shall have ability to understand the nature of his act, to know his property, and to remember and recollect the natural objects of his bounty is in itself an elastic and variable measure, necessarily dependent upon the character and extent of the testator's property and the number and relation to him of the objects of his bounty.    But the argument is more specious than sound.    The degree of mental capacity that would enable Mr. Matheson's neighbor to understand the nature of his act in making a will, to know that he had a house and lot, and to remember his wife is the same degree of capacity, no lower and no higher, that would enable Mr. Matheson to exercise this testamentary right if he understood the nature of his act in making a will, comprehended in a general way what property he had, and recalled the names and their relation to him of his wife and children. For the law to go further and assume, and upon that assumption lay it down as an instruction binding upon the triers of fact, that a higher or different degree of mental capacity was required to enable Mr. Matheson to understand the nature of his act, to know his property and the objects of his bounty, because he had more property and more children than his neighbor, is to assume as a fact something that is at least open to doubt.    Is it a fact that

mental capacity bears any such certain and definite relation to material quantities, amounts, and numbers that the Courts may take judicial cognizance thereof, and incorporate such relation into the legal test of testamentary capacity? If so, then the man with one piece of property may make a will; another with two may not. The man with a wife and no children may make a will; the one with a wife and six children may not. A will that leaves property as a whole to the wife may be good, but one that attempts to divide the same property among the wife and several children would be invalid. Obviously, a legal test of testamentary capacity open to that construction and application would be equivalent to giving *carte blanche* to juries to set aside, or, in effect, rewrite wills at pleasure. I am clearly of the opinion that what seems to be the holding of the New York and Pennsylvania Courts (Page on *Wills,* § 98), that testamentary capacity does not depend upon the size of the estate or the complexity of the will, is the sounder doctrine, and more closely in line with the settled law of this jurisdiction. It is proper to observe here that the foregoing discussion is directed wholly to the question of testamentary capacity. Upon the issue as to undue influence, involving fraud and imposition, the size and extent of the estate and the character of the will might have a bearing entirely legitimate and of controlling force.

But the proposition of law charged by the trial Court requires consideration in a second aspect that will be briefly discussed. Even conceding that testamentary capacity might properly be defined as "a sound mind with reference to whatever is involved in the transaction," may it be further defined as a degree of capacity "that varies according to the extent and value of the property," etc.? Certainly it is not and could not be contended that testamentary capacity varies in exact mathematical ratio to the extent and value of the property involved; that, where a man had testamentary capacity to will one house and lot, worth $1,000,

if he had property worth $100,000, invested in 100 different properties or securities, it would in the latter case require 100 times greater mental capacity to make a valid will. But if testamentary capacity "varies according to the extent and value of the property," the instruction is clearly susceptible of the construction suggested—that for the $100,000 man 100 times greater capacity would be required to make a will than for the $1,000 man. The test thus indicated is striking in its apparent simplicity, and as easily applied as a rule of the multiplication table. That any attempt literally to apply such a rule would lead to absurdity is too clear to require discussion. Even if the presumption be indulged that the jury in the case at bar were too intelligent to apply the instruction in the literal sense suggested, still no reasonable application of the proposition can be made that does not involve the inference that the law required of A. J. Matheson, possessed of an extensive estate valued at $1,000,000 a tremendously higher degree of mental capacity to make a will—higher in the proportion that his estate was more extensive and valuable—than was required of the average man in ordinary circumstances. The instruction authorized an erroneous legal test of testamentary capacity that under the facts of this case was clearly misleading and prejudicial.

For the reasons indicated, I concur in the opinion of Mr. Justice Fraser.

MESSRS. JUSTICES COTHRAN and FRASER concur.